IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. PWG-19-0137 |
| DONTE BENNETT, | |
| Defendant | |

**GOVERNMENT RESPONSE IN OPPOSITION TO THE
DEFENDANT'S MOTION TO RECONSIDER THE DETENTION ORDER**

Defendant Donte Bennett moves for the Court to reconsider the order of detention entered by the Honorable A. David Copperthite. *See* ECF 530. Bennett does not challenge any of Judge Copperthite's factual findings, nor does he attack the presumption that applies in favor of detention. As detailed in the Third Superseding Indictment, and presented to Judge Copperthite during the government's proffer at the detention hearing, overwhelming evidence establishes that Bennett participated in large-scale drug trafficking conspiracy, distributing large quantities of heroin, fentanyl, and cocaine. On one occasion, Bennett distributed the heroin/fentanyl that caused two people to later overdose and be hospitalized. On another occasion, Bennett distributed heroin/fentanyl to his own father, who later overdosed and died.

Instead of contesting Judge Copperthite's findings on their merits, Bennett relies on the speculative prospect of a COVID-19 outbreak at Chesapeake Detention Facility ("CDF"), the pretrial facility where he currently is housed. Yet neither Bennett nor any other detainee at CDF has been diagnosed with or exposed to COVID-19. Further, CDF administrators and staff have established comprehensive precautionary measures to previse transmission of COVID-19 into CDF. Moreover, Bennett's requested relief would place an untenable strain on the resources of

1

the Pretrial Office and the Court.  In light of those measures, and given the medical resources to which Bennett has access at CDF, the Court should conclude that Bennett's continued detention is necessary to protect the public, and that the emergence of COVID-19 is not a card to be played by armed drug traffickers who wish to get of jail.

## BACKGROUND

Donte Bennett is a member of a large-scale drug trafficking organization that distributed multiple kilograms of heroin/fentanyl and cocaine throughout Maryland and surrounding states. The distribution of the heroin/fentanyl resulted in multiple fatal and non-fatal overdoses through the region. The indictment also alleges that Bennett's distribution of heroin/fentanyl caused three people to overdose. Two people were hospitalized and one person died. From at least November 2018 through February 2019, investigators with the Federal Bureau of Investigation ("FBI") intercepted phone calls and text messages of members of the drug trafficking organization, including Bennett. Interceptions of Bennett reveal that Bennett worked as a street-level drug distributor for the organization, often selling hundreds of grams of heroin/fentanyl a week. Interceptions captured Bennett discussing with co-conspirators the rate of drug sales, the quality of drug product, the supply of drugs, and other drug trafficking activities. For example, on February 23, 2019, at around 1:52 p.m., Bennett spoke to co-defendant Tirell Saunders by phone. During that call, Bennett and Saunders talked about Bennett's current supply of drugs:

**Bennett**:   Oh alright, so uh what I mean, you know I still that clip in here."

**Saunders**: Yeah, that one.

**Bennett**:   Yeah, uh I don't know how much I'm down to, I'm in the car right now but uh I'm a hit you probably when I'm down to like 20. I had a whole I think 120, 80 I think. Yeah 80.

**Saunders**: 180?

**Bennett**: No, I only had 80.

2

The investigation revealed that one "clip" equaled approximately 120 grams of heroin/fentanyl and that distributors used numbers to refer to the amount of narcotics in grams. Thus, in just the single call transcribed above, Bennett admitted to selling approximately 100 grams of heroin/fentanyl on a single date.

Bennett's distribution also caused multiple overdoses. On or about November 10, 2018, Bennett sold heroin/fentanyl to co-defendant Timothy Legard. Legard, in turn, distributed the heroin/fentanyl to two people in Virginia who overdosed on the drugs and were hospitalized. Later that month, Bennett distributed heroin/fentanyl to his own father. Investigators believed Bennett's father used those narcotics, overdosed, and died.[1] On November 21, 2018, investigators intercepted Bennett admitting to his father's overdose in a call with Butler:

**Butler**: Yo.

**Bennett**: Whoadie, 'ey yo that shit you got, yo, yeah I ain't, I ain't sayin it [inaudible] happen, that shit killed my father.

**Butler**: Huh? Say it again.

**Bennett**: That shit killed my father.

**Butler**: What? The shit that we got?

**Bennett**: Mmhm.

**Butler**: Goddamn, yo. I'm sorry to hear that yo. God, how the fuck that happen?

**Bennett**: I don't know.

**Butler**: Huh?

**Bennett**: No, he ain't tell me that [inaudible]. I did I get it [inaudible] yesterday, yesterday that's

---

[1] A toxicology report for Bennett's father indicates that his father also recently used another controlled substance which the government does not currently believe Bennett provided. This report has been provided to the defendant.

3

>     when he died.

**Butler**:   For real.

**Bennett**: Yep.

**Butler**:   Goddamn, that shit crazy, yo. Wasn't even supposed to be doing that shit, yo you hear me?

**Bennett**: Yeah.

Bennett nonetheless continued to distribute hundreds of grams of heroin/fentanyl despite knowing the danger these drugs posed to the community. On March 2019, a federal grand jury sitting in the District of Maryland returned an Indictment, charging Bennett and other members of the drug trafficking conspiracy. On January 20, 2020, a federal grand jury sitting in the District of Maryland returned a Third Superseding Indictment. The Third Superseding Indictment charges Bennett with the Conspiracy to Distribute Controlled Substances Resulting in Death and Serious Physical Injury, in violation of 21 U.S.C. § 846. Count Six charges Bennett with Distribution of a Controlled Substance Resulting in Serious Physical Injury, in violation of 21 U.S.C. § 841. ECF 447. Bennett faces a mandatory minimum of twenty years of incarceration and a maximum term of life imprisonment if convicted of either count.

On April 8, 2019, Bennett made an initial appearance on the indictment. On April 9, 2019, Judge Copperthite held a detention hearing. At the conclusion of the hearing, Judge Copperthite found by clear and convincing evidence that no condition or combination of conditions would reasonably assure community safety and the defendant's appearance at trial. ECF 109. In reaching this decision, Judge Copperthite highlighted several factors, including: (1) Bennett's significant role in drug trafficking; (2) the strong evidence proving the defendant's guilt; (3) Bennett's

distribution of heroin/fentanyl to his father; and (4) Bennett's continued distribution of narcotics even after his father's fatal overdose. *Id.*[2]

## ARGUMENT

I. **The Appeal Ignores Nearly All of the Section 3142(g) Factors, Which Weigh Heavily in Favor of Detention**

Bennett's appeal, which focuses exclusively on the COVID-19 outbreak, largely ignores the factors a court must consider in determining whether a defendant poses a danger to the community and upon which Judge Copperthite relied in ordering detention. These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because of the nature of the charges against Bennett, the Government also is entitled to a presumption that no combination of release conditions will assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A).

In this case, an examination of the § 3142 factors, which Bennett ignores, demonstrates that the detention order should remain in place.

### A. The Nature and Circumstances of the Offenses

Bennett distributed large quantities of heroin, fentanyl, and cocaine on a weekly basis for months. While Bennett served as a street-level distributor, he sold on a daily basis what many open-air drug markets in Baltimore sell in weeks. Interceptions show that Bennett distributed more

---

[2] The government's proffer did not include information regarding the November 10, 2018 non-fatal overdoses caused by Bennett. The government was investigating the overdoses at the time. Since that date, the grand jury returned the Third Superseding Indictment which charges Bennett with distribution resulting in serious physical injury relating to that event.

5

than a kilogram of fentanyl/heroin, which the organization sold at approximately $70 per gram. To put this in context, a single dose of heroin/fentanyl typically amounts to one tenth of a gram. As the Court is aware, hundreds of people die every year in Baltimore alone from overdosing on heroin and fentanyl. In this case, the evidence will show that Bennett's distribution resulted in three people overdosing, including Bennett's own father. Bennett did not stop, however, and continued to distribute these narcotics.

### B. Weight of the Evidence

The evidence against Bennett is overwhelming. Bennett was intercepted in multiple wiretapped calls and text messages distributing narcotics. These interceptions are corroborated by the numerous other interceptions in the case, as well as law-enforcement seizures of narcotics. With respect to the November 10, 2018 overdoses, wiretap interceptions capture Bennett arranging the drug sale of the heroin/fentanyl that caused the overdoses. Witness testimony will corroborate the chain of causation linking Bennett's distribution to the two overdoses. And with respect to the overdose of Bennett's father, Bennett admitted on a wiretap to the distribution.

### C. History and Characteristics of the Person

The government recognizes that Bennett has an extremely limited criminal history and does not believe that this factor weighs in favor of detention.

### D. The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

Bennett's conduct is extremely dangerous. The defendant participated in an armed drug trafficking organization that distributed narcotics through the Mid-Atlantic region in kilogram quantities. Many of the same concerns regarding Bennett's risk to the community continue to exist, The only difference now is that Pretrial Services is even less able to actively monitor the defendant due to the ongoing COVID-19 pandemic.

6

**II.   Officials Have Established Comprehensive Health Measures at CDF to Avoid a COVID-19 Outbreak**

Bennett himself does not contest this analysis, focusing instead on the health risks posed by the COVID-19 outbreak. To be sure, the Bail Reform Act instructs courts to consider the "physical and mental health" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of Bennett's release. Currently, there are no cases of COVID-19 at CDF. Bennett acknowledges that he does not have COVID-19. He does not allege that he has been exposed to any individuals with COVID-19. In this way, he is not seeking release based on his actual health issues, but rather, the possibility of becoming infected. As discussed below, however, CDF has implemented substantial precautionary measures to mitigate this risk.[3]

**A. Comprehensive Precautionary Measures Have Been Instituted at CDF to Avoid a COVID-19 Outbreak**

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has established a comprehensive set of precautionary measures to limit the risk of COVID-19 transmission into and inside CDF.[4] DPSCS is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative actions advised by the Centers for Disease Control and Prevention ("CDC") and Maryland Department of Health ("MDH") regarding the disease.

---

[3] The following individuals provided information about the health measures that have been established at CDF: (1) Gary McLhinney, DPSCS Assistant Secretary; (2) Sharon Baucom, DPSCS Director of Clinical Services; (3) Sterling Johnson, Supervisors, USMS for the District of Maryland; and (4) DPSCS Lieutenant Nina Rizer.

[4] Although CDF is a facility for federal pre-trial detainees, it is managed by DPSCS pursuant to a contract with the USMS.

7

DPSCS officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail, and longstanding policies and procedures already exist to ensure an outbreak does not occur of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza. When faced with the potential for transmission of other notable viruses in recent history—such as, Avian Influenza (i.e., bird flu), H1N1, Severe Acute Respiratory Syndrome (i.e., SARS), and Ebola—DPSCS facilities, including CDF, did not suffer any outbreaks.

That being said, DPSCS recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulting in a state of emergency. Accordingly, DPSCS has employed the following measures at CDF[5]:

- *Social Visitation.* DPSCS has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering CDF and interacting with detainees.[6] Defense attorneys are still permitted to visit their clients in person; however, attorneys and detainees are separated by a glass wall and communicate with each other through the use of a telephone.

- *Detainees Entering the Facility.* Unlike many of DPSCS's facilities, which are needed to house the constant influx of new state arrestees, CDF houses federal detainees and, at this time, few federal detainees are entering CDF. The only new detainees entering CDF are a limited number of new arrestees who present a particular safety risk to the community and individuals already are in transit to the facility.

- *Screening Procedures.* In the few instances in which a new detainee enters CDF, he will be housed in an intake facility for approximately one week, where he will be screened by

---

[5] Because the health situation is rapidly evolving, new policies and procedures at CDF are constantly being implemented.

[6] Due to the hardship this poses, DPSCS has given each detainee five free telephone calls per day to ensure that each detainee is able to remain in contact with friends and family members.

medical professionals for coronavirus symptoms and exposure risk factors before being placed in the general population.

- *Detainee Movement.* The Court's Second Amended Standing Order postponed all criminal trials scheduled to commence through April 24, 2020, and postponed all criminal proceedings through March 27, 2020. Case No. 1:00-mc-0302, ECF No. 93 (filed Mar. 14, 2020). This means that detainees will not need to leave CDF during this period for any court appearances, except for emergencies. In the event that a detainee has a court appearance, he will be screened for symptoms before entering the transport van and, upon reaching the courthouse, his temperature will be taken twice via a forehead thermal reader to ensure he does not have a fever. To further avoid the possibility of exposure, the USMS has issued a prohibition on prisoner transfers to the courthouse or elsewhere for proffers, including a prohibition on agent transport writs and Chief Judge Bredar memorandum requests that would permit agents to pick up prisoners from a facility.

- *Sanitation and Hygiene.* Each detainee is in possession of his own supply of soap to wash his hands at any time throughout the day. Moreover, CDF recently completed a $1.1 million shower renovation, as a result of which detainees may shower whenever they wish. Signs and hand sanitizer have been posted throughout the facility, educating detainees and correctional officers about proper hygiene and encouraging them to wash their hands frequently. The Secretary of DPSCS also has ordered that all facilities, including CDF, increase surface cleaning. In addition to paid sanitation employees, CDF has trained a group of detainees whose full time job is constantly to disinfect and clean all surfaces that could be touched.

- *Quarantine.* DPSCS is following the CDC guidelines regarding testing for COVID-19 and isolation of individuals with symptoms and/or risk exposure factors. If a detainee exhibits flu-like symptoms or presents risk exposure factors, designated cells in a remote part of CDF have been set aside to serve as a quarantine area, where medical professionals can monitor those detainees. Across the street from CDF is a DPSCS facility with "negative pressure rooms," where the ventilation is designed to avoid re-circulating air into the general population to limit the possibility of cross-contamination from room to room.

- *Correctional Officers.* Although correctional officers will need to enter and re-enter the facility, they have received multiple mandatory trainings over the past week about how to mitigate the risk of exposing detainees to the disease. Correctional officers have been ordered to stay home if they have any symptoms of the disease, and advanced paid leave will be provided for any employees who have not accrued sufficient paid leave, to disincentive sick employees from coming to work to avoid loss of pay.

Finally, in order to ensure that the Court remains apprised of these and other precautionary measures, the USMS has been in contact with Chief Judge Bredar. The USMS has appointed

9

Steven D. Akers, the former Assistant USMS Chief, to serve as a liaison with the Court, and to respond to any inquiries regarding conditions at CDF and the measures being taken in response to the COVID-19 situation.

### B.  Bennett's Medical Needs Are Adequately Being Addressed at CDF

Although Bennett states that he is in particular danger because of his medical history, his medical needs are being met and safety measures are in place at CDF in the event of an outbreak. When Bennett first was arrested and transported to CDF, he underwent an extensive intake process, whereby he was screened and examined by licensed medical professionals who are now fully apprised of his medical condition.

By virtue of being in a detention facility, Bennett is in the presence of medical professionals at all times.  Each DPSCS facility has privatized medical doctors and nurses who monitor and provide care onsite to detainees who have chronic diseases, such as asthma, diabetes, and hypertension.  There are multiple points of access for detainees with asthma and other chronic diseases to seek medical care, whether for routine or emergency needs, including on-site dispensaries, infirmaries, and clinics that provide acute and chronic treatment for these types of illnesses. DPSCS also contracts with on-site pharmacists, who are available to help providers make the best recommendations for Asthma therapy and other chronic diseases.  In addition, clinical pharmacists are on call at all times, day or night.  If Bennett should need intensive treatment that cannot be provided inside CDF, there is a hospital located directly across the street from CDF to provide non-emergency care and detainees are transported to community hospitals in the event of an emergency.

Between the medical professionals at CDF and the medical professionals at the hospitals, Bennett has access to all of the care that he needs. In the event that Bennett becomes infected with COVID-19, he will be quarantined, monitored, and receive any needed treatment, consistent with

the CDC guidelines. And if Bennett needs specialized care for an unforeseen illness or injury, the medical staff at CDF will refer him to an outside professional. In short, there are sufficient resources, both inside and outside CDF, to ensure that Bennett's medical needs are addressed.

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside. *United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). In this case, Bennett simply has not made a factual record that his needs will not be met while detained.

### III.   Releasing Defendants Like Bennett Would Place An Undue Burden on the Pretrial Services Office and the Courts

Bennett asks to reside with a family member pursuant to location monitoring. Awarding such relief would place a substantial and unwarranted burden on the Pretrial Services Division of the U.S. Probation Office, as well as the Court. Whenever the Court orders electronic monitoring, a Location Monitoring ("LM") Specialist is appointed to oversee the Defendant's pretrial release. In the Northern Division, there are only two LM Specialists, each of whom currently handles approximately 30 cases.[7] To be sure, one case, by itself, would not strain the system. Yet if the Court released Bennett then undoubtedly an avalanche of defendants would also seek release. Releasing such defendants would not only endanger the community; it would quickly stretch the bandwidth of existing LM specialists beyond its breaking point.[8]

Similarly, the Court would be flooded by appeals of defendants seeking pretrial release. The Magistrate Judges in this District, however, have repeatedly detained defendants like Bennett to protect the community *from them*. The speculative prospect of a COVID-19 outbreak at CDF does not diminish the public interest in keeping armed drug dealers off the streets. In light of the protective measures now in place at CDF, and given DPSCS's prior track record in avoiding viral outbreaks at their facilities, the specter of a COVID-19 outbreak is not a fire alarm that defendants can pull because they wish to get out of jail. The continued detention of defendants like Bennett is necessary to ensure public safety and does not endanger public health.

### CONCLUSION

---

[7] This information was provided by W. Scott Smith, Deputy Chief U.S. Probation Officer.

[8] Before a Defendant is placed on release, a Pretrial Services Officer also must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these Officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection.

For the foregoing reasons, the Court should deny Bennett's motion and order his continued detention pending trial.

                              Respectfully submitted,

                              Robert K. Hur
                              United States Attorney

By:        /s/_____
     Matthew DellaBetta
     Assistant United States Attorney
     36 South Charles Street
     Fourth Floor
     Baltimore, Maryland 21201
     (410) 209-4800

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 14th day of March 2020, a copy of the foregoing Government's Response was served via ECF to counsel of record.

/s/
Matthew DellaBetta
Assistant United States Attorney